**HAWKINS et al. v. TEXAS CO.**

**No. 9643.**

Court of Civil Appeals of Texas. Austin.

June 25, 1947.

Rehearing Denied July 9, 1947.

James P. Hart, of Austin, and Ben D. Clower, of Dallas, for J. C. Hawkins.

Price Daniel, Atty. Gen. of Texas, and Elton M. Hyder, Jr., Asst. Atty. Gen., for Railroad Commission of Texas.

Fred T. Couper, Jr., of Houston, and Black & Stayton, of Austin, for appellee.

HUGHES, Justice.

This case involves the validity of an order of the Railroad Commission granting appellant J. C. Hawkins permission to drill a tenth well on his 21.6-acre oil lease, in the Thomas J. Moore Survey in Rusk County. The permit was granted under Rule 37 to prevent physical waste.

The Texas Company, appellee, filed suit to cancel such permit and recovered judgment as prayed for. Hawkins and the Railroad Commission have appealed.

The order of the Railroad Commission must be sustained if supported by substantial evidence. Trapp v. Shell Oil Co., Tex.Sup., 198 S.W.2d 424.

"Substantial evidence" to support an exception to prevent physical waste must meet the test announced by the Supreme Court in Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022, page 1026, as follows: "In order to be

valid a discrimination between persons must have a reasonable basis in fact. There must be some factual basis for classifying some applicants as subject to the general spacing provisions of the rule and other applicants as within the exception. This reasonable basis can only be a showing of unusual conditions peculiar to the area where the well is sought to be drilled —not testimony that would be equally applicable to any other part of the field. Therefore, in order to sustain the validity of the rule we must give it the construction that the exception is to be granted only upon a showing of unusual conditions."

■ We are of the opinion that the evidence fails to measure up.

The permit was granted December 23, 1940, Commissioner E. O. Thompson dissenting. This suit was filed January 25, 1941. The well authorized by the permit has not been drilled.

The drill density of the Hawkins lease, with nine wells, is 2.4 acres per well. If the tenth well is drilled the density would be reduced to 2.16 acres per well.

The drill density of the surrounding rectangular area eight times the size of the Hawkins lease, excluding the area lying outside the limits of the East Texas field, is 2.81 acres per well.

The drill density of the surrounding circular area eight times the size of the Hawkins lease excluding nonproductive areas, is 3.29 acres per well. The drill density of the entire East Texas field in December 1940 was about one well to 5 acres.

Mr. J. S. Hudnall, a petroleum geologist and petroleum engineer, was appellants' only witness. On direct examination he testified in support of the permit substantially as follows: As to a map, prepared by the witness, showing locations of pumping wells, plugged and abandoned wells and sub-marginal wells, on several surveys, including the Moore Survey in which the Hawkins lease is located, in the East Texas field, Mr. Hudnall testified that the cause for such wells being submarginal or abandoned or pumping was tight sand and low pressure—the sand being tighter than the average of the field, and that on a tight

sand area the drainage of a well is smaller. That more uniform spacing of wells in this area would promote a greater recovery of oil, "because the wells always cease to produce for one or two reasons. They either cease to produce, due to water flooding them out, or due to pressure decline. In the case where the water floods them out, the water at the bottom of the hole where the intake is, is always at a higher level than it is out in the spaces removed from the bottom of the hole, so that the wells go to water by virtue of the water being a little higher at the well bore than it is out away from the well bore; consequently, there is oil left in between wells and out away from the wells that is not recovered; and the farther that those distances are removed from the well, the more oil is left, and the drilling of a well at those more distant points from any wells that are producing will recover a large part of that oil that is left."

As to the decline in pressure, Mr. Hudnall testified that this was not important since water injection in the East Texas field has stablized pressure.

On cross-examination Mr. Hudnall testified that no wells had been abandoned on the Hawkins lease—nor immediately to the north of the lease; that all the wells in this general area are on the pump and in the eight times area no wells flow.

Mr. Joel A. Battle, Jr., a petroleum engineer for appellee, testified that the Hawkins lease, in December 1940, had substantially as much oil beneath it as was there originally, this because of favorable drainage conditions as to this lease. Mr. Hudnall had calculated the recoverable oil under this lease in December 1940 as about 200,000 barrels. It was shown by the records of the State Comptroller that this lease produced 300,305 barrels of oil during the period December 1940–December 1946.

Mr. Hudnall also testified concerning another map introduced by appellants, as follows:

"Q. Mr. Hudnall, will you explain what the situation is as shown by that map? A. It is a cut-out map of the entire field. This portion of it is the portion lying immedi-

ately west of this tract, with the tract near the center, and extending entirely across the field.

\* \* \* \* \* \*

"The map represents the state of depletion of the field at this time, and shows that there are islands left. For instance, here is an area on the Sinclair-Prairie Mayfield Company lease completely surrounded by wells that have been plugged and abandoned. Some have been plugged and abandoned as much as three years, while the offset well 300 feet away is still producing, and in this particular case it still makes its allowable. There are two other wells that don't quite make the allowable, but are still producing in this particular island where all around it they have been plugged and abandoned for one to three years. There is a similar island west of it where the wells have been plugged and abandoned around it for two or three years and this area continues to produce. There is an island on the McMurray Oil Company's G. A. Turner lease completely surrounded by plugged and abandoned wells, the well to the east having been plugged on April 1, 1945, and the Number 10 is still producing and making the allowable. The offset to it to the north was plugged in 1943, the diagonal offset to the northwest was plugged in 1942, and the offset to the south—it is not really an offset—was plugged July 1946. There is a big island formed at this time over on the Humble's Walter Shaw lease and the Humble's J. E. Wheelis lease. This island is essentially surrounded by plugged and abandoned wells to the west, northwest, north, northeast, and east, and partially to the south, but not nearly so much plugging to the south. The wells that are in the white area in this island are free of water probably yet, and will continue to produce five or six years in my judgment. Some of these wells to the east of it were plugged as early as 1940. Some of the wells in the island will continue to produce thirty-five or forty thousand barrels after these wells have been plugged and abandoned. There are already holes pushing up through the sand in here. That is illustrated on the Gulf's Thrash lease, where there is one well in the middle of the field, where there was 90 feet of formation above the watertable, that has already been plugged and abandoned, and no other plugged and abandoned wells within a half-mile of it. If you should make a development map like this by months you would see islands forming and going out of the picture, and areas plugged and abandoned before the areas west of it were plugged and abandoned. If there were no wells in that area, that is all that would be left there. You have the same thing on the east side. There are wells that have been plugged and abandoned over in the east part. The color symbols are exactly the same. Some have been plugged as early as 1940 and 1941, and 300 feet away they are producing and will continue to produce fifty to seventy-five thousand barrels yet. This is merely a portion of the map we keep up on the entire field, and it is not selected for any other particular purpose than to show what actually exists in that reservoir.

\* \* \* \* \* \*

"Q. Directing your attention briefly to (the map), that extends all the way across the field from west to east. I believe it is your opinion that if you had drilled that area more densely than it was drilled the recovery would have been increased; is that correct? A. Yes, sir.

"Q. You think that is true of the whole area from the west side to the east side? A. Yes, sir."

Mr. Hudnall supported his opinion by quoting from a Bureau of Mines Report relating to a detailed study of the Woodbine fields which are nearly depleted to this effect: In the Mexia and Curry fields where the drill density was 5.9 acres per well the recovery was 723 barrels per acre foot; in the Powell field a drill density of 3.5 acres a recovery of 939 barrels per acre foot; in the Richland and Wortham fields a drill density of 2.25 acres and a recovery of 1314 barrels per acre foot.

There is much other testimony in the record but the above is sufficient to show that the basic reason for the drilling of this well is that more wells will result in the ultimate recovery of more oil. That this is not the character of waste contemplated by Rule 37 is expressly held in Railroad Commission v. Shell Oil Co., supra.

The testimony of Mr. Hudnall shows a general condition not restricted to this lease nor its immediate vicinity, and hence no peculiar or unusual local conditions are shown.

Appellants also assign as error the action of the trial court in excluding from the evidence the transcript of the evidence introduced before the Railroad Commission. The same evidence was reproduced in the trial court, and the error, if any, is harmless.

'The permit was improvidently granted and the trial court did not err in decreeing its cancellation.

Judgment of the trial court is affirmed.

Affirmed.