## J. C. HAWKINS ET AL V. THE TEXAS COMPANY.

No. A-1390. Decided February 4, 1948.
Rehearing overruled March 31, 1948.
(209 S. W., 2d Series, 338.)

512

*Ben D. Clower*, of Dallas, *Hart & Brown* and *James P. Hart*, all of Austin, for J. C. Hawkins, and *Price Daniel, Attorney General*, and *Elton M. Hyder, Jr.*, Assistant Attorney General, for the Railroad Commission, petitioners.

*Fred T. Couper, Jr.*, and *John C. Jackson*, both of Houston, and *Black and Stayton*, of Austin, for respondents.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

As an exception to Rule 37, and "to prevent physical waste," the Railroad Commission of Texas, with its chairman, Colonel Thompson, voting "no," granted to petitioner, J. C. Hawkins, on December 23, 1940, a special permit to drill a tenth well on a 21.6 acre tract of land in the eastern part of the East Texas oil field. This suit to test the validity of the order was filed by respondent, The Texas Company, which is the owner of an oil and gas lease of a 30.54 acre tract of land, on which there are

six producing oil wells, lying to the north of and immediately adjoining the 21.6 acre tract. The trial court's judgment cancelling the permit and enjoining the drilling of the well was affirmed by the Court of Civil Appeals. 203 S. W. (2d) 1003. Two applications for writs of error, one by petitioner, J. C. Hawkins, the applicant for the permit, and the other by the Railroad Commission of Texas, were granted.

The correctness of the judgments of the district court and the Court of Civil Appeals is to be tested by the application of the "substantial evidence rule." Thomas v. Stanolind Oil & Gas Company, 145 Texas 270, 198 S. W. (2d) 420; Trapp v. Shell Oil Company, 145 Texas 323, 198 S. W. (2d) 424; Railroad Commission of Texas v. Mackhank Petroleum Co., 144 Texas 393, 190 S. W. (2d) 802; Railroad Commission of Texas v. Shell Oil Company, 146 Texas 286, 206 S. W. (2d) 235; Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S. W. 73.

Notwithstanding the above cited decisions, the application for writ of error filed herein in behalf of the Commission suggests misunderstanding or uncertainty as to the meaning of the substantial evidence rule and as to the scope of judicial review in a suit to test the validity of an order of the Commission filed pursuant to Section 14 of Chapter 76, Acts Regular Session, 44th Legislature (Section 8, Article 6049c, Vernon's Annotated Civil Statutes). That application, quoting from the dissenting opinion in the Trapp case, above cited, states in substance that the rule should be and is that in the trial of a case like this, as soon as a single witness testifies to facts which would sustain the permit, it will become useless for the court to proceed further, for regardless of the evidence to the contrary, the court will be powerless to do otherwise than sustain the permit. The substantial evidence rule does not mean that.

Repeatedly in the above cited decisions and in other decisions the court, in making a brief statement of the scope of judicial review of the facts in a suit filed under Section 8 of Article 6049c to test the validity of an order of the Railroad Commission, has said that the finding of the Commission will be sustained by the court if it is *reasonably* supported by substantial evidence, meaning evidence introduced in court. The word "reasonably" has been deliberately used in the statement and its use gives to the judicial review broader scope than it would have if *some* substantial evidence were regarded sufficient of itself to sustain the Commission's order. It is for the court to determine as a matter of law the reasonableness of the support

afforded by substantial evidence. Thomas v. Stanolind *Oil & Gas Co.*, 145 Texas 270, 273, 198 S. W. (2d) 420; Trapp v. Shell Oil Company, Inc., 145 Texas 323, 350, 198 S. W. (2d) 424.

In making its decision of this question the court examines and takes into consideration all of the evidence, the entire record. Trapp v. Shell Oil Co., 145 Texas 323, 341, 349, 198 S. W. (2d) 424. It does not look merely to the evidence offered by one of the parties, or to the testimony of one or two witnesses, and sustain the Commission's order if that evidence or testimony can be regarded as substantially supporting the order. In that procedure there would be no real review of the factual basis for the Commission's order, and no trial in court. It clearly appears from the language of Section 9 of Article 6049c that there must be a trial in court of the suit brought to test the validity of the Commission's order. This, according to the decisions above cited, does not mean a trial as of the ordinary civil suit in which the court makes its own findings based upon a preponderance of the evidence before it. Nevertheless, it means that there shall be a trial and in that trial, in so far as the facts are concerned, the court determines from all of the evidence before it, the entire record, whether the Commission's action is or is not reasonably supported by substantial evidence. The foregoing is a reiteration of the explanation of the substantial evidence rule made in Railroad Commission v. Shell Oil Co., the Trem Carr case, which was quoted with approval in the Trapp case above cited, and part of which is as follows:

"This does not mean that a mere scintialla of evidence will suffice, nor does it mean that the court is bound to select the testimony on one side with absolute blindness to that introduced by the other. After all, the court is to render justice in the case. The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence. The court is not to substitute its discretion for that committed to the agency by the legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court." 139 Texas 66, 79, 161 S. W. (2d) 1022.

The facts in this case are undisputed, except that there is some differences in the opinions expressed by the two petroleum engineers who testified, one for petitioners and the other for respondent. The 21.6 acres Hawkins tract is situated in the extreme east part of the East Texas oil field and in the south one-third of the field. When the application for the permit to drill the well was filed and granted there were nine producing

oil wells on the tract. In the general area of the tract all of the oil wells were pumping wells, none flowing. There were a number of submarginal wells, that is, wells that will not make twenty barrels of oil daily, and a number of plugged and abandoned wells to the east, northeast and southeast of the Hawkins tract, the better wells being to the south, west and north.

The Hawkins tract, with its nine wells, has been drilled to a density of 2.4 acres per well. If a tenth well should be drilled, the density would be reduced to 2.16 acres per well. The well density of the rectangular area eight times the size of the Hawkins tract, excluding the portion that is not productive, is 2.81 acres per well, and the density of the eight times circular area, excluding the nonproductive part, is 3.29 acres per well. Respondent, The Texas Company, has six wells on its thirty acre tract immediately north of the Hawkins tract, giving it a density of five acres per well. The average density of the East Texas oil field is a well to a little over five acres. These calculations are based upon conditions existing in 1940, when the application for the permit was heard by the Commission. Rule 37, as amended July 24, 1939, and applicable to the East Texas oil field in December, 1940, provides that no well shall be drilled in the field nearer than 660 feet to any other well, and that no well shall be drilled nearer than 330 feet to any property or lease line, a spacing of one well to ten acres, but it permits the Commission to grant exceptions and permit drilling within shorter distances whenever the Commission shall determine that such exceptions are necessary either to prevent waste or to prevent the confiscation of property.

The East Texas oil field is a Woodbine reservoir of great size. It consists of a relatively porous sand connected throughout the length of the field through which the oil drains freely, the movement of the oil being from west to east and pressure being maintained by a water drive. In 1940 there were about 25,000 producing oil wells in the East Texas field, of which 16,000 were flowing wells and 9,000 were pumping wells. About 4,000 of the pumping wells were on the west side of the field, being pumping rather than flowing wells because of water conditions. The other 5,000 pumping wells were in the east part of the field and they had to be pumped because in that part of the field the sand was thinner and somewhat tighter and the pressure lower than in the other part of the field. The Hawkins tract is situated in that area of the field where the wells were and are pumping wells. All of the wells in the general area of the Hawkins tract, including the eight times area, were pumping

wells. The area in which the wells were pumped comprised in 1940 about 25,000 acres of the East Texas field, there being then about 125,000 producing acres in the entire field. Further east as the sand becomes thinner and tighter and the pressure lower, the end of the producing field is reached.

The petroleum engineer Battle, who was called as a witness by respondent, testified that the amount of the recoverable oil beneath the Hawkins tract originally was approximately 215,000 barrels. Production statements from the State Comptroller show that about 200,000 barrels of oil were produced from the Hawkins tract prior to December 1940, and that about 300,000 barrels were produced from the tract during the period from December, 1940, to December, 1946. The petroleum engineer Hudnall, who was called as a witness by petitioners, testified that the recoverable oil beneath the Hawkins tract in December, 1940, was approximately 200,000 barrels. The actual production so greatly in excess of the estimates of recoverable oil made by the two experts is explained by the drainage to the tract from the lands to its west, the oil produced having been replaced by oil moving in from the west.

As to the question whether the drilling of a tenth well would prevent waste, the opinions of the two expert withnesses differ. Battle testified that the nine wells that had been drilled on the land would ultimately produce all of the recoverable oil under it and that the drilling of an additional well would not increase the ultimate recovery. He testified further that drilling an additional well would have a bad effect, saying that such drilling has a tendency to lower the bottom hole pressure in the area, and that as the pressure is lowered, the gas which is dissolved in the oil comes out of solution, thereby increasing the viscosity of the oil and tending to clog the pores of the sand with gas bubbles, and in this way hindering drainage.

After having testified that the sand under the Hawkins tract was relatively tighter than the average in the East Texas oil field, and that the bottom hole pressure was about 850 pounds, being lower than the average of the field, which was 1057 pounds, Hudnall expressed the opinion that, considering the conditions as they existed in December, 1940, the drilling of a tenth well would increase the recovery of oil from the tract. It clearly appears from an examination of the whole of Hudnall's testimony that this opinion is the expression of the "more wells, more oil" theory that has often been presented for support of permits to drill additional wells in order to prevent waste. The

opinion of the witness is not based upon unusual conditions peculiar to the Hawkins tract. The theory, according to his testimony, is applicable to a very large part of the East Texas oil field and even to the most productive part of the field. The witness testified that in average sections of the East Texas oil field or even in the best part of it, assuming all wells to be drilled on the 660 foot spacing pattern of Rule 37, a substantial quantity of oil would be left in the field, being trapped by the water as it encroaches. He expressed the opinion that to insure the greatest ultimate recovery of barrels of oil from the field wells should be drilled closely, even in the best, thickest and most porous sections of the field.

Hudnall further testified that in an average section of the East Texas oil field, with a spacing of one well to ten acres, or 660 feet between the wells, the recovery of oil per acre foot would be approximately six hundred to eight hundred barrels; with a spacing of one well to five acres, nine hundred to one thousand barrels; and with a spacing of one well to two and a half acres, a further increase, although not as great, in the recovery per acre foot. As to the Hawkins tract area, he testified that considering the density there in December, 1940, he would expect the recovery per acre foot to be something in the neighborhood of one thousand barrels. In connection with Hudnall's testimony petitioners offered in evidence a map showing a vast part of the East Texas field and the oil wells in it, extending entirely across the field from west to east, with the Hawkins tract about halfway between the north and south line of the part of the field covered by the map. The witness testified that in his opinion it was true of the whole area, from the west side to the east side, that the recovery of oil would have been increased if the area had been drilled more densely than it had been drilled.

It is shown by Hudnall's testimony and by maps in evidence that in the general area of the Hawkins tract, being a large part of the East Texas field, all the wells were pumping wells, none flowing, and Hudnall testified that the wells in that area were pumping wells because a lower pressure and slightly tighter sand there than in the average parts of the field. Expressing his opinion as to the effect of closer spacing of wells where those conditions existed, as compared with its effect in the better parts of the field, he testified that there closer spacing would cause the recovery of a greater percentage of the oil in place and that in the other, the better parts of the field,

closer spacing would cause the production of a greater quantity of oil in barrels than would otherwise be produced.

Thus the testimony is an argument in favor of closer spacing of wells, whether in the better part of the field or in the poorer part where the Hawkins tract is situated. If it means that closer spacing is more important to increase ultimate recovery where the sand is somewhat tighter, the pressure lower and the potential somewhat lower than in other parts of the field, those conditions are not peculiar to the Hawkins tract, but they are shown by the testimony to exist in a very large area extending north, west and south from the Hawkins tract where the wells are pumping rather than flowing wells. The testimony, therefore, continues to be in substance and effect an attack upon the spacing rule, which by the Commission's order had been made applicable to the entire East Texas field, including that large area, and it is not evidence that will support an exception to the rule on account of peculiar conditions in the tract upon which the additional well is sought to be drilled.

■ This testimony or theory of "more wells, more oil" has been rejected in many decisions which have held that it will neither justify nor support an exception to prevent waste, in the absence of proof of conditions underlying the tract on which the well is sought to be drilled different from those in the adjacent area or the part of the field in which the tract is situated. Railroad Commission v. Shell Oil Co. (Trem Carr case) 139 Texas 66, 73-75, 161 S. W. (2d) 1022; Railroad Commission v. Marathon Oil Co., 89 S. W. (2d) 517, application refused; Letwin v. Gulf Oil Corp. 164 S. W. (2d) 234, application refused; Railroad Commission v. Shell Oil Co., 165 S. W. (2d) 502; Marine Production Co. v. Shell Oil Co., 165 S. W. (2d) 934; Railroad Commission v. Magnolia Petroleum Co., 169 S. W. (2d) 794; Trapp v. Atlantic Refining Co., 169 S. W. (2d) 797, application refused; Holcomb v. Atlantic Refining Co., 172 S. W. (2d) 523; Hinchliffe v. Texas Company, 182 S. W. (2d) 368, application refused; Humble Oil & Refining Co. v. Trapp, 194 S. W. (2d) 781, application refused. It should be observed here that the part of the opinon in the Trem Carr case cited above which supports the rule last stated was neither disapproved nor criticized in Trapp v. Shell Oil Co., 145 Texas 323, 198 S. W. (2d) 424. The statements in the opinion in the Trem Carr case disapproved in the Trapp case were those which defined or seemed to define a scope of judicial review or a procedure different from the substantial evidence rule announced in the Gulf Land Company-

Atlantic Refining Company case and approved in the Trapp case.

After careful consideration of all of the evidence introduced and admitted on the trial in the district court, we approve the conclusion which was reached by the Court of Civil Appeals that the Commission's finding of necessity to make an exception to the spacing rule and grant the permit to drill the additional well in order to prevent waste is not reasonably supported by substantial evidence.

The same conclusion follows from the fact that there is no proof in the record that a *substantial* amount of oil would be saved by drilling the additional well. The only evidence suggesting that the drilling of that well would prevent waste is the testimony of the witness Hudnall, much of which has been reviewed herein. On direct examination he testified that the recovery of oil from the Hawkins tract would be increased by the drilling of an additional well. Thereupon, to the question whether the increased recovery would be substantial or only a trival amount, he answered that it would be substantial in percentage, but due to the fact that the sand was thin the total amount would not be very great. The witness was questioned several times on cross examination and redirect examination about an additional recovery if the tenth well were drilled, and he never expressed an opinion as to the amount of an additional recovery or that the amount would be substantial. Several times he referred to the amount of oil the additional well would produce that would not otherwise be produced as a small quantity. Having testified that the tenth well, if drilled, would utimately produce about 75,000 barrels, he said further that some of that oil would be the small quantity that would not be produced by the existing wells without a tenth well. Again he testified that a greater percentage of the oil in place would be recovered if the well applied for were drilled, but he did not explain what the percentage would be or what percentage in his opinion would be a substantial percentage.

In Gulf Land Company v. Atlantic Refining Company, 134 Texas 59, 70, 131 S. W. (2d) 73, "waste" as used in Rule 37 is thus defined: "The term 'waste,' as used in oil and gas Rule 37, undoubtedly means the ultimate loss of oil. If a substantial amount of oil will be saved by the drilling of a well that otherwise would ultimately be lost, the permit to drill such well may be justified under one of the exceptions provided in Rule 37 to prevent waste." In Humble Oil & Refining Co. v. Turnbow,

133 S. W. (2d) 191, application refused, there was testimony that if the special permits to reopen and operate two wells on a two and a half acre tract were sustained there would be recovered by the operation of the two wells a minimum of 25,000 to 30,000 barrels of oil that would not be recovered by any other well, but would be left in the ground. The court in sustaining the permits quoted the above definition of waste given in the Gulf Land Company-Atlantic Refining Company case, and held that the testimony brought the case squarely within that definition. There is no evidence in the instant case that a *substantial* amount of oil would be saved by the drilling of a tenth well. The testimony is merely that the recovery of oil from the tract would be increased, or that a small quantity not otherwise produced or a greater percentage of oil would be recovered.

Petitioners insist that this case, because of similar facts, should be ruled by Thomas v. Stanolind Oil and Gas Company, 145 Texas 270, 198 S. W. (2d) 420, but there are material differences in the two cases. In the Thomas case the permit was issued to prevent waste and to prevent confiscation, and would have been sustained by the court if the facts supported either one of the two grounds. In the instant case we have only the question of waste. Only a few lines of the opinion in the Thomas case are given to a statement of the evidence relevant to waste. They set out the substance of the testimony of an expert witness that in his opinion an additional well would result in recovering *"a substantial amount of oil* which would not otherwise be recovered" and that "the sands underlying this ten acre tract are less permeable than those in the field as a whole and *less permeable than the Dollahite lease adjoining it;* that in his opinion the sand conditions underlying *this area* are *different from those in the remaining part of the field* and such conditions require more dense drilling in order to recover the oil in place than is required in the field as a whole." (Emphasis added). This shows conditions underlying the particular tract different from those in the lease adjoining it and different from those in the remaining part of the field.

The opinion in the Thomas case contains no express ruling that the permit would have been sustained as necessary to prevent waste, but it is devoted almost wholly to a discusson and ruling upon the question of confiscation. Primarily at least the permit was sustained because the ten acre tract, on account of concentrated drilling around it on the four ten acre tracts bounding it on its four sides, was at a disadvantage in density of drilling and could not, without the additional well, produce its fair

share of the oil that migrated, from the west, to it and the adjoining tracts.

■ Petitioners assign error to the action of the trial court in excluding the transcript of the evidence heard by the Railroad Commission. The only evidence in the transcript offered is the testimony of the witness Hudnall, who testified in person on the trial in district court and gave there and at greater length substantially the same testimony as that which he had given before the Commission. Under these circumstances there was no error in excluding the transcript and it is unnecessary to enter into a discussion of the question as to when or for what purposes a transcript of the evidence or a part of the evidence heard by the Commission may be admitted on the trial in district court.

It is contended that the district court should be informed as to the nature of the evidence which was heard by the Commission, because the Commission is required to hold a hearing which should be thorough and careful. In this case there is no attack on the Commission's order as having been made without a hearing or for the lack of proper procedure. The suit was filed to test the validity of the order in its factual basis, and the facts have been fully developed by the evidence offered and ad-admitted on the trial in court.

The judgments of the district court and the Court of Civil Appeals are affirmed.

Mr. Justice Hart, disqualified and not sitting.

Mr. Justice Garwood not participating.

Opinion delivered February 4, 1948.

Rehearing overruled March 31, 1948.

MR. JUSTICE SIMPSON, dissenting.

I do not differ with the expressions in the majority opinion as to the proper scope of judicial review in such cases as this. But I feel constrained to dissent from the view that the Railroad Commission's action in granting the permit was not reasonably supported by substantial evidence. It occurs to me that the proof adequately demonstrates that it was. So my dissent.

Opinion delivered March 31, 1948.