**TEXAS LIQUOR CONTROL BOARD,**
Appellant,

v.

**C. JOHNSON, Appellee.**

No. 15764.

Court of Civil Appeals of Texas.

Fort Worth.

Jan. 11, 1957.

John Ben Shepperd, Atty. Gen., of Texas, and William H. Davis, Asst. Atty. Gen., for appellant.

Philip M. Shafer, Houston, for appellee.

BOYD, Justice.

Acting through its Assistant Administrator, the Texas Liquor Control Board, after notice and hearing, made an order canceling C. Johnson's beer and wine retail license, and Johnson appealed to the District Court. Upon a trial, the court set aside the order of the Board, and the Board has appealed.

The basis for the order canceling the license was a finding that appellee Johnson had on three occasions permitted intoxicated persons to remain on the premises included in the permit. The court found that the finding was not reasonably supported by substantial evidence.

Appellee and his family lived on the premises in question and operated a cafe and grocery store. He had been selling beer under a license for six years continuously before his permit was canceled. There was testimony that no complaint had ever been made to the officers about the conduct of the business, and that on several occasions the officers thoroughly examined the premises, including the living quarters, and at no time was appellee cautioned or reprimanded.

Appellee testified that: he never permitted drunk people to remain on his premises; he knew that his license would be canceled if he did; his wife, two daughters, and a son-in-law worked in the establishment, and they had strict instructions to report to him if any drunk person was there; he had asked some to leave; he ran a quiet place; there was never any "bad" language; his place was in a residential area, and most of his customers were married and settled; most of the business was from married couples coming there together; they were laboring people, and he never had large crowds except on Friday and Saturday nights; he furnished a band, and there was dancing in the cafe; many of the people in the neighborhood came from Louisiana and spoke French; he could not understand them; they did a French dance, the "zitico," the music coming from an accordion and a rubboard; "They get up and go round and round;" some drank beer, some danced, and some just listened to the music; he worked behind the bar, but often walked among the people to see what was going on; no one there was drunk on the dates in question; on October 23, 1955, the officers were called "for a fight on the street" about one-half block from his place; they did not find the people, and then the officers came into his place; they told him he had too many people there and they were going to close the place and take a lot of the people to jail; "he told me to stop the Victrola, and as they started out they arrested them at the door;" some of those arrested had just got there and had not been served.

Appellee's wife testified without dispute that Liquor Control Board officers many times inspected their premises and had never objected to anything; and that October 23, 1955, was the first time an arrest had been made at their place.

Several persons whose alleged drunkenness occasioned the cancellation hearing testified on the trial, and all denied being intoxicated. Some said they had drunk no alcoholic beverage on the days in question, and some said they had never drunk such beverages. One said he went in to cash a check and was arrested immediately, and that he had not drunk anything that day. At least one paid a fine, although he testified that he had drunk nothing. Some were released, and the record fails to show what became of the cases against the others.

Appellant offered the record of the proceedings before the Board, and the testimony of three witnesses, Officers Ross, Smith, and Ontevaris.

According to Ross, he received a call about a fight at appellee's place shortly before midnight, October 22, 1955; when he got there, appellee told him there were so many people there he did not know what

had happened; witness returned to the premises shortly after midnight and found Martin and a woman in front of the place; the woman said that Martin played in the band, was her husband, had been with another woman, and she wanted to file charges against him; witness went into the cafe and "They all said the same thing; this man was playing and she came in and started fighting with him, and bit him on the shoulder and arm;" he found several people whom he thought were drunk; some were "wobbly" on their feet and could not stand up; they were "milling around the place and on the dance floor, and some of them standing up against the posts at the side, holding to the posts and if they turned loose they could hardly walk. * * * one of the reasons that we arrested them, you couldn't understand them." The breath of some "was strong with alcoholic beverage of some kind." "I would say the place was so crowded that anybody standing behind the bar couldn't see what was going on. It was just like Johnson says." He made four arrests for drunkenness; he was in the cafe on November 5, 1955, and found two men against whom he filed charges for drunkenness; there was no disturbance either time he was there.

Smith testified that: he was called to the locality on November 5, 1955, to investigate a "gang fight" but found none; he was accompanied by Ontevaris; they were in the place four or five minutes before they started making arrests for drunkenness; several people were arrested; he did not know how long any of the alleged drunk people were in the cafe before he got there; Johnson made no attempt to put anybody out; there was no disturbance, and no loud or obscene language.

Ontevaris testified substantially as follows: he was called to the area on November 26, 1955, "to assist car 151 at that location in a gang fight;" the fight "had apparently dispersed" when he got there; one Greaze was being held by the officers in front of the cafe, and was charged with aggravated assault upon an officer; the officers went into the cafe and started "signing them up;" ten were "jailed" for alleged drunkenness; when people were sitting down he could not tell whether they were drunk; no charge was filed against appellee.

Over appellee's objection, appellant introduced a transcript of the proceedings before the Board. We have examined it, for whatever it may be worth on this appeal, and find that while testifying on the hearing, appellee was asked, "Are you still selling whiskey?" and "Are you still selling marijuana?" There was no evidence before the Board or before the court that appellee ever sold either. Appellee filed with the Administrator affidavits of eight people whom the officers said were drunk at his place. All the deponents denied being drunk on the occasions in question. On the trial, appellee's wife testified without contradiction that the Administrator folded the affidavits and did not look at any of them.

Articles 667–19, 667–19B of the Penal Code provide that a beer and wine retail permit may be canceled or suspended if the licensee permits any intoxicated person to remain on the premises covered by the permit. Article 666–14 provides that an appeal from any order of the Texas Liquor Control Board or its Administrator refusing, canceling, or suspending a retail permit may be taken to the District Court, and that the proceeding on appeal shall be against the Board alone as defendant, and the trial shall be de novo under the same rules as ordinary civil cases, with certain exceptions not here relevant.

■ It is now established that on an appeal from the orders of an administrative agency such as the Texas Liquor Control Board, even under a statute providing for a trial de novo, the decision of the agency will be sustained if it is reasonably supported by substantial evidence, meaning evidence adduced in court. Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338; Trapp v.

Shell Oil Co., Inc., 145 Tex. 323, 198 S.W. 2d 424; Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420. On such an appeal, the scope of review is therefore limited to the inquiry as to whether the finding of the agency is so supported. The application of the rule so limiting the inquiry is, however, often attended with difficulty.

"The duty of defining the jurisdiction of the court to hear and determine fact questions under our oil and gas conservation statutes has given us very grave concern. * * * We think, however, that, generally speaking, the law contemplates that the Commission shall be left free to finally determine controverted issues of fact." Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, 82. It has been held that the court will not substitute its judgment for that of the agency, and will not decide whether, under the evidence offered on a trial, the court itself would reach the same conclusion as did the agency; but will decide only whether there is substantial evidence to support its finding. Texas Motor Coaches v. Railroad Commission, Tex.Civ. App., 59 S.W.2d 923.

In Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338, 340, it was said that in the formulation of the rule that the order of the agency will be sustained if it is reasonably supported by substantial evidence, the word "reasonably" was deliberately used and its use "gives to the judicial review a broader scope than it would have if *some* substantial evidence were regarded sufficient * * *. It is for the court to determine as a matter of law the reasonableness of the support afforded by substantial evidence. * * *

"In making its decision of this question the court examines and takes into consideration all the evidence, the entire record. * * * It does not look merely to the evidence offered by one of the parties, or to the testimony of one or two witnesses, and sustain the Commission's order if that evidence or testimony can be regarded as substantially supporting the order. In that procedure there would be no real review of the factual basis for the Commission's order, and no trial in court."

In Railroad Commission v. Shell Oil Co., Inc., 139 Tex. 66, 161 S.W.2d 1022, 1029, the court said: "After all, the court is to render justice in the case. The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence." In Trapp v. Shell Oil Co., supra [145 Tex. 323, 198 S.W.2d 440], it was held that the court is not required to consider incredible, perjured or unreasonable testimony, "because such evidence is not substantial."

The question whether the court may weigh the evidence gives us some concern. We have found no authority which simply says that it may or may not do so. But if the court must look to, examine, and consider all the evidence, it would not seem unreasonable for the court to evaluate what it looks at. And if the court may not evaluate evidence, it is not clear to us how it may disregard incredible, perjured and unreasonable testimony, or ever know whether such testimony exists.

With the possible exception of the call to investigate the incident of the wife's biting her husband, there is no evidence that anything transpiring at appellee's premises occasioned any visit of the officers. Appellant's license was not canceled because of a reported "gang fight" in the street; or because Martin was bitten by his spouse; or because appellee was asked at the hearing if he was still selling whiskey and marijuana.

The testimony that some of the people were drunk was opinion evidence, however persuasive. From four to ten minutes was as long as the officers knew that anybody was there on either occasion. It is not unusual for the breath of a customer of a beer

parlor to smell of alcoholic beverage; such was little evidence of a violation of the law. The court may have thought that the officers were already convinced that the law was being circumvented in some way, such as by selling whiskey or narcotics, or by street fighting, and evidence which ordinarily would seem slight appeared to them to be "confirmation strong as proofs of holy writ."

█ The statute does not undertake to define what constitutes "permitting" a person to "remain" on the premises. There is authority, however, for the proposition that the mere entrance of a drunk man into premises is not sufficient to prove that the operator "permitted" him to "remain" there. In Tinkle v. Sweeney, 97 Tex. 190, 77 S.W. 609, the Supreme Court construed a statute allowing recovery on a bond if a liquor dealer permitted a minor to "enter and remain" in such place of business. The Court said: "The definitions of the word [remain] as given in Webster's International Dictionary are: '(1) To stay behind after others have withdrawn. * * * (2) To continue unchanged in place; * * * to abide; to stay; to endure; to last.' * * * In Baldwin v. Ely, 66 Wis. [171] 198, 28 N.W. 392, the Supreme Court of Wisconsin say, 'The word "remain" presupposes and implies something that exists or continues after some other time or event.'" See also Minter v. State, 33 Tex.Civ.App. 182, 76 S.W. 312; Cox v. Thompson, 32 Tex.Civ. App. 572, 75 S.W. 819; Odom v. State, 156 Tex.Cr.R. 42, 238 S.W.2d 968; Douthit v. State, 98 Tex. 344, 83 S.W. 795.

█ We cannot say that appellee or his employees knew or should have known that any drunk person "remained" on the premises in the meaning of that term as construed in the cases last above cited; or that the court erred in concluding that the order of the Board was not reasonably supported by substantial evidence.

The judgment is affirmed.