Richard CUSSON, Appellant,

v.

**FIREMEN'S AND POLICEMEN'S CIVIL
SERVICE COMMISSION OF SAN AN-
TONIO, Texas, et al., Appellees.**

No. 15361.

Court of Civil Appeals of Texas,
San Antonio.

May 28, 1975.

Hernden, Brown & Campion, A. L.
Hernden, San Antonio, for appellant.

Crawford B. Reeder, City Atty., Jackson C. Hubbard, Jake N. Talley, Asst. City Attys., San Antonio, for appellees.

CADENA, Justice.

Appellant, Richard Cusson, complains of the refusal of the district court to set aside the order of the Firemen's and Policemen's Civil Service Commission of the City of San Antonio dismissing him from his position as patrolman in the San Antonio Police Department.

Appellant does not here contend that the procedural requirements prescribed by the Firemen's and Policemen's Civil Service Act (Article 1269m, Vernon's Tex.Rev. Civ.Stat.Ann. [1963]) were not followed, nor is there any doubt that, following the entry of the dismissal order by the commission, appellant timely perfected his appeal to the district court as permitted by Section 18 of the statute.

The rules adopted by the commission in obedience to the mandate of Section 5 of the statute provide that a fireman or policeman may be removed or suspended for neglect of duty, failure or refusal to carry out instructions, acts of misconduct while on duty, or violation of any rules or regulations of the department. The written charges filed by the police chief accused appellant of failure to carry out the instructions given him by the police dispatcher; signing a false report; committing an unnecessary act of violence toward a prisoner; and failure to preserve the peace, prevent crime and enforce the ordinance of the city and the laws of the state.

■ The scope of judicial review of the commission's order is, of course, limited by the substantial evidence rule. There are countless decisions to the effect that the order of an administrative agency must be upheld if it is reasonably supported by substantial evidence introduced in the trial court. It is also well settled that in reaching its decision the court must consider all of the evidence heard by it. The decisions also announce that the statement of the test in terms of a finding that the administrative order is *reasonably* supported by substantial evidence gives a broader scope to judicial review than that which would be permissible if the test merely required that the order be supported by *some* substantial evidence. Lewis v. Southmore Savings Association, 480 S.W.2d 180, 184 (Tex.1972); Hawkins v. Texas Company, 146 Tex. 511, 209 S.W.2d 338, 340 (1948). It would appear that the statement of the test in terms of *reasonable* support, rather than *some* is but another way of stating that the reviewing court must consider all of the evidence.

■ Appellant calls our attention to cases such as Texas Liquor Control Board v. O'Fallon, 189 S.W.2d 885, 888 (Tex.Civ. App.—Dallas 1945, no writ), where it was said: " 'Substantial evidence' . . . is such evidence as will convince reasonable men, and on which such men may not reasonably differ; that is, competent evidence as a reasonable mind might accept as adequate to support a conclusion." Although this language was quoted with approval by the Amarillo Court of Civil Appeals in Lowe v. Texas Liquor Board, 255 S.W.2d 252, 257 (1952, no writ), it is not only erroneous but self-contradictory. To say that a finding is reasonably supported by substantial evidence only when the evidence is such that reasonable men may not reasonably differ is to say that a conclusion is reasonably supported by substantial evidence only when the existence of the fact is established beyond a reasonable doubt, since if doubt as to the existence of the fact can be classified as reasonable, it cannot be said that men may not reasonably differ as to the existence of such fact. This notion concerning the meaning of the test is clearly incompatible with the second part of the *O'Fallon* which speaks of substantial evidence as "evidence as a reasonable mind might accept as adequate to support a conclusion." As we understand the test, the question is not whether the administrative conclusion is one as to which men

"may not reasonably differ," but, rather, whether reasonable men might, from the evidence, reach the conclusion which the agency reached. That is, in reviewing administrative action, a reviewing court is concerned with a reasonableness of the action, rather than with its "rightness." That is, an administrative decision must be upheld if it is reasonable, under all of the evidence, even though in the opinion of the reviewing court the decision is not "right" in the sense that the reviewing court would have reached a different conclusion on the same evidence. This is what is meant when it is said that a court, in reviewing administrative action, may not substitute its judgment for that of the administrative agency.

█ The fact-finding process often, if not always, requires the drawing of inferences from the evidence. That is, "A fact finder may draw inferences from the words or gestures or inflections or demeanor of a particular witness, may infer a particular basic fact from the testimony of one or more witnesses on one side or on both sides, and may assume an ultimate fact from undisputed basic facts or from an entire record of conflicting evidence." 4 Davis, Administrative Law Sec. 29.05, p. 137 (1958). If, from the evidence, although conflicting, reasonable minds might find the existence of the basic fact, A, and if, from the existence of fact A, reasonable minds might infer the existence of the ultimate fact, B, then the reviewing court must conclude that the finding of the existence of fact B is reasonably supported by the evidence, even though the court, given the same evidence, would conclude that the "right" inference is that of the nonexistence of B. A correct application of the substantial evidence rule makes it essential that this distinction between "reasonable" and "right" be kept in mind constantly. Even if we indulge the presumption that "right" conclusions are necessarily reasonable, this does not mean that "wrong" conclusions are necessarily unreasonable.

█ It is also well settled that the party seeking to set aside the order of an administrative agency has the burden of proving that the order is not reasonably supported by substantial evidence. Redd v. Texas Employment Commission, 431 S.W. 2d 16 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n. r. e.). This conclusion is compelled by the fact that where judicial review of administrative action is governed by the substantial evidence rule, the action of the administrative body is presumed to be valid. City of San Antonio v. Texas Water Commission, 407 S.W.2d 752 (Tex. 1966). We make this observation because the record before us reflects that the trial court was of the opinion that the burden was on the administrative agency to establish that its action was reasonably supported by substantial evidence. That is, the trial court placed on the commission the burden of establishing the validity of its action. The burden of producing evidence establishing the invalidity of the administrative action is clearly on the party challenging the action. However, since the trial court ruled in favor of the validity of the commission action, the error in requiring that the commission come forward with evidence establishing the validity of its action was harmless.

The question we must decide, then, is whether the evidence introduced in the trial court establishes that the action of the commission is not reasonably supported by substantial evidence. Stated differently, the question is whether, in view of all of the evidence heard by the trial court, appellant discharged his burden of establishing that the action of the administrative agency was, to use the stereotyped phrase, "arbitrary, capricious and unreasonable."

### 1. *Failure to Carry Out Dispatcher's Instructions.*

█ Rule 44 of the "Rules and Regulations of the San Antonio Police Department" states that all officers, regardless of

rank, "shall carry out the instructions given them by the Dispatcher." The charge that appellant violated this rule was supported by a specific allegation that on October 16, 1973, at 4:30 A. M., while he was on duty, appellant "failed to make a call at 7757 Highway 90 West, as directed by the police dispatcher."

At the time in question, appellant was on patrol in a police car. At that time, a student in the San Antonio Police Academy, Cadet Felton Randall, as part of his training prior to his appointment to the position of patrolman in the police department, was riding with appellant. At about 4:30 A. M., the car was stopped and appellant was out of the car. Cadet Randall, who had remained in the car, received, over the car radio, instructions to investigate a "suspicious vehicle" at 7757 Highway 90 West, in San Antonio. When appellant returned to the car, the cadet informed him of the call. According to the cadet's testimony, appellant stated that they were not going to "make the call," and that Randall should wait "five, maybe ten minutes" and then call the dispatcher and ask for a case or assignment number and write a report. Randall, while he was waiting as instructed by appellant, wrote a report. He then called the dispatcher, received a case number, placed that number on the report, and handed the report to appellant. Appellant, after reading the report, said it was "fine" and signed it.

The report, which was turned in as an official report in accordance with official regulations by appellant, states: "Was sent to the above loc. for a suspicious RED VEGA, UNK YEAR AND UNK LICENSE PARKED behind the Texas Speed Shop at the above loc. . . . could find no suspicious veh. or persons." The evidence establishes that the report is in the handwriting of Cadet Randall and signed by appellant. In a square captioned "Time and Date Prepared," there appears, in a different handwriting, "0615 10–16–73."

Cadet Randall testified that he remained with appellant until 6:00 A. M., at which time Randall's tour of duty ended, and that appellant did not go to 7757 Highway 90 West to investigate the red Vega as ordered by the dispatcher.

Appellant testified that 7757 Highway 90 West was the address of a business establishment known as Texas Speed Shop, which had been burglarized prior to October 16. Because of the burglary, he had been paying particular attention to that location. For one or two days prior to October 16 he had noticed a red Vega parked there, and he testified that it was obvious to him that the car was being worked on. The Texas Speed Shop is an establishment which sells parts for automobile racers. He testified that he had told Cadet Randall that he was familiar with the red Vega, but denied telling Randall that they were not going to make the call. He stated that about an hour after the call was received he drove by the Speed Shop and saw the red Vega.

There is testimony by several police officers to the effect that it is customary for San Antonio policemen, when they are instructed by the dispatcher to investigate a "suspicious vehicle," not to respond to the call if they are familiar with the vehicle and location in question and have previously determined that nothing is amiss. That is, if they have previously investigated the vehicle and address given by the dispatcher and have satisfied themselves that the vehicle is not, in fact, a suspicious vehicle, they do not, when instructed by the dispatcher to investigate the presence of that vehicle at that location, they do not return to the location and conduct a further investigation. However, the testimony concerning the procedure to be followed in such a case is not unequivocal. There is testimony which reasonably supports the conclusion that the practice is to inform the dispatcher that the presence of the vehicle has been previously noted and investigated, and that the officer is satisfied that nothing further need be done.

From the testimony as a whole, a reasonable mind could conclude that, in the absence of an explanation to the dispatcher explaining the circumstances which made a response to the call unnecessary, it was appellant's duty to obey the dispatcher's instructions.

## 2. *Making a False Report.*

Rule 29 provides that no police officer shall willfully misrepresent any matter or "sign any false official statement or report. . . ."

Much of the testimony outlined in connection with the charge of failing to carry out the instructions of the dispatcher is relevant to this charge. Appellant does not contend that the report signed by him was other than an official statement or report, but he insists that in view of the testimony concerning the practice with respect to instructions to investigate suspicious vehicles, his report was not "false." His testimony to the effect that he went to the location about an hour after he received the call is contradicted by the testimony of Cadet Randall.

One of the officers called to testify by appellant, after referring to the common practice among San Antonio police officers concerning calls relating to suspicious vehicles, testified, when shown the report filed by appellant, that he would not have worded the report as appellant did. No witness testified that he would have filed a report worded as was the one filed by appellant. The report clearly indicates, or, at least, can reasonably be construed as stating, that, in response to the dispatcher's instruction, appellant went to the Speed Shop and was unable to find a suspicious vehicle. This is clearly a reasonable interpretation of the statement to the effect that appellant "was sent" to the location in question. Even if the evidence is such as to compel the conclusion that San Antonio policemen habitually, with reference to instructions to investigate suspicious vehicles, file reports stating that they had responded to the call when in fact they had not, this does not establish that such reports are not, in fact, false. A "true" report under the circumstances would have stated that appellant had already investigated the vehicle in question and his investigation had revealed no reason for suspicion.

It should be pointed out that the only officer above the rank of patrolman who testified on behalf of appellant was a lieutenant who was not asked questions relating to what appellant describes as common practice among patrolmen. There is no evidence that the custom was approved, or even known, by any member of the department who occupied a supervisory position. Widespread deception is, despite its prevalency, still deception.

## 3. *Acts of Violence Toward a Prisoner.*

After Cadet Randall had completed his tour of duty, appellant heard the dispatcher send Officer Trawick, who was on patrol in a district adjoining that of appellant, to investigate a robbery. Appellant notified the dispatcher that he was in the area and that he would go to the scene to "back up" Officer Trawick. Appellant arrived at the scene from which the robbery was reported, a filling station, before Officer Trawick. When he arrived he was approached by Ervin Carelock, who represented that he was the victim of the robbery and informed appellant that the robber was in a car parked behind the station. Appellant went behind the station and, after a few minutes, returned with the suspect, James Crowton. The suspect had been handcuffed, with his hands behind his back. Appellant placed the suspect in the back seat of the police car and Carelock sat with appellant in the front seat to answer questions concerning the robbery.

After a few minutes Officer Trawick arrived in a police car. With Trawick in the car was Police Cadet Felix Orosco. Trawick took the suspect, Crowton, who was sitting, handcuffed, in the back seat of appellant's car, directly behind appellant,

out of the police car. There is testimony, which will be summarized in connection with the final charge against appellant, that the prisoner was beaten and kicked by Trawick at that time and, later, at a different location. The only testimony of physical violence toward the prisoner by appellant was given by Carelock, the alleged victim of the robbery, who stated that appellant struck Crowton in the face with his flashlight while Crowton, handcuffed, was sitting quietly in the back seat of appellant's car. Appellant denied striking Crowton, saying that the only time he touched Crowton was when he asked Carelock if Crowton was one of the men who had robbed him, at which time appellant lightly touched Crowton on the shoulder with a flashlight.

Carelock admitted that during the hearing before the commission he had testified that appellant had "never touched" Crowton "in any way besides the time when he put him in the police car. . . ." In a sworn statement given to police authorities on the day after the incident in question, Carelock stated, "At no time did I see the robbers being abused by Officer Cusson, or did the robbers show any marks of being abused." However, the testimony shows that Carelock had previously signed another statement reciting that appellant had hit Crowton with a flashlight.

Crowton did not testify. The record does not reflect his present whereabouts.

■ Proof of prior contradictory statements does not compel rejection of the present testimony of a witness. This should be particularly true when there is evidence to indicate that the prior statement was not correct. The statement made by Carelock on October 17 sets out not only that Carelock did not see the "robbers being abused," but adds that the "robbers" did not "show any marks of being abused." All of the evidence is to the effect that only one "robber" was involved in the incident in question. All of the evidence establishes that the "robber"

did show signs of being "abused." Appellant so testified and, in fact, in obedience to the instruction of a superior officer, appellant took Crowton to a hospital. Appellant testified that, even if he had not been so instructed, he would have taken Crowton to the hospital.

Under the circumstances, we cannot say that a reasonable mind would have rejected Carelock's testimony at the trial. Carelock's testimony at the trial, if believed, reasonably supports the conclusion that appellant struck Crowton with a flashlight. Further, in view of circumstances which will be pointed out later, a reasonable mind might conclude, in view of all the testimony, that appellant was not giving a correct version of the incident.

### 4. *Failure to Prevent Abuse of Prisoner.*

The final specification alleges that while appellant had Crowton under arrest and handcuffed in appellant's custody, appellant observed Officer Trawick kick, beat and pull the hair of Crowton, and appellant failed to stop or attempt to stop the abuse of his prisoner.

According to Carelock's account of the alleged robbery, he had been robbed by two men. After appellant had apprehended Crowton, he questioned the prisoner concerning the identity of the other alleged robber. When Trawick and Orosco arrived on the scene, they went to appellant's car. Appellant told Trawick that the prisoner's answers were not satisfactory. It is undisputed that Trawick then took the prisoner out of appellant's car. According to Orosco and Carelock, Trawick pulled the handcuffed prisoner out of the back seat, on appellant's side of the car, by grabbing the prisoner by the hair. Orosco testified that Trawick took the prisoner about 8 or 10 feet away and began beating him, knocking the prisoner to the ground. While the prisoner was on the ground Trawick kicked him. According to both Orosco and Carelock, the prisoner was screaming, asking Trawick to stop and insisting

that he knew nothing of a shotgun which Carelock had reported had been used in the robbery and saying, "I don't know."

While this was going on, Carelock was in the front seat of appellant's car. Appellant was also in the car, sitting in the driver's seat. Orosco was outside appellant's car, on the driver's side. Orosco testified that while Trawick was using violence on the prisoner appellant told Orosco and Carelock that "this is the way it has to be done," and told them that they hadn't "seen" anything. Carelock testified that he could not see what was happening, but that he heard Crowton screaming. Appellant testified that he saw nothing and heard nothing. He admitted telling Orosco "This is the way it has to be done," but he explained that he was merely referring to the fact that it is unwise to keep a robbery victim and the suspected robber in each other's presence. He did not, at the trial offer any explanation for the fact that, prior to the arrival of Trawick, he had been questioning the victim and the suspect in each other's presence.

When Trawick put the prisoner, still handcuffed, back in appellant's car, appellant noticed that the prisoner had been beaten. Trawick and Orosco then returned to Trawick's car, and both cars then proceeded to a location on Springdale Street, apparently to an address where Crowton had said the other alleged robber could be found. Trawick, on the police radio, told appellant that it appeared that Crowton was leading them on "a wild goose chase." Both cars stopped. Trawick went to appellant's car and pulled Crowton out of the back seat. According to Orosco, Trawick threw Crowton to the ground. All of the evidence establishes that appellant was also out of his car. Orosco testified that he noticed that a woman was standing across the street, watching what was going on, and that when he brought this to appellant's attention appellant told Trawick, "Cool it." According to Carelock, he heard Orosco mention that a lady was watching and heard appellant say, "Stop it, somebody's watching."

After making another stop to question a young man emerging from a house which, apparently, Crowton had designated as the home of the other alleged robber and determining that such person was in no way involved, the two police cars returned to the filling station.

According to appellant, when Trawick returned Crowton to appellant's car at the filling station and appellant noted that the prisoner had been beaten, Trawick explained that the prisoner had attempted to escape.

In view of the testimony of Orosco and Carelock, it can reasonably be concluded that appellant could not avoid knowing that something was happening a few feet away. According to Orosco's testimony, appellant saw Trawick throw the prisoner to the ground on Springdale Street. Appellant's explanation that his remark to Orosco that "this is the way it has to be done," meant merely that the victim and the suspect should not be kept in each other's presence can reasonably be rejected in view of the fact that at all times thereafter appellant kept both the suspect and the victim in his car, rather than placing one or the other in Trawick's car. Orosco, who was standing on one side of appellant, heard the prisoner screaming. Carelock, who was sitting on the other side of appellant, heard the prisoner screaming and, although he could not see what was happening, correctly interpreted the screams as evidence that the prisoner was being beaten. Under all the circumstances, a reasonable mind might properly conclude that appellant's statement referred to resort to violence. This is particularly true in view of the fact that the remark about the manner in which things had to be done was accompanied by a suggestion that Orosco and Carelock "hadn't seen nothing."

We conclude that the evidence before us, considered in its entirety, does not warrant the conclusion that the action of the commission is without reasonable support in substantial evidence.

The judgment of the trial court is affirmed.