

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| BASIC ENERGY SERVICES, LP, | § | No. 08-23-00218-CV |
| Appellant, | § | Appeal from the |
| v. | § | 143rd Judicial District Court |
| PPC ENERGY LLP and PRIEST PETROLEUM CORPORATION, | § | of Reeves County, Texas |
| | § | (TC# 20-01-23355-CVR) |
| Appellees. | § | |

## MEMORANDUM OPINION

The adage that oil and water don't mix may be true in a chemistry lab, but not so in Texas oil fields. Some oil wells require the injection of water to augment oil production. And for some wells, significant quantities of water arrive with the oil and gas at the surface. This case deals with the consequence of reinjecting that water back into the ground and its ability to flood out a productive oil and gas well.

PPC Energy LLP and Priest Petroleum Corporation (collectively PPC), are oil well operators. They sued Basic Energy Services, LP, and several other disposal-well operators, for drowning out PPC's producing oil wells with wastewater from nearby disposal injection wells. PPC settled with the other disposal well operators, leaving only Basic by the time of trial. A jury found Basic negligent (as defined in the charge), and that its conduct proximately caused 60% of the injury. Based on the answer to the damages question, the trial court entered a substantial

judgment against Basic. On appeal Basic challenges the jury charge, the admission of expert testimony, and the factual sufficiency of the evidence to support the verdict. We conclude that there was error in the charge and remand for a new trial.

## I. BACKGROUND

### A. Factual background

PPC's nine oil wells and Basic's commercial disposal well are in the Matthews Consolidated Field in Reeves County, Texas. This field includes geologic formations within the Delaware Mountain Group, including ancient canyons which were each formed and filled in over the ages, one on top of the next. The result are channels within the three canyon formations—Bell Canyon, Cherry Canyon, and Brushy Canyon—that crisscross each other at different geologic depths. The sandy deposits at those depths contain recoverable hydrocarbons.

But most of the oil wells in the area, including PPC's, are "low volume marginal wells." These wells can still be profitable, but generate a large amount of wastewater—sometimes as much water is produced as oil. PPC operated its own disposal well to inject its wastewater back underground, but other operators of producing wells contracted with commercial disposal well operators, like Basic, to carry out this task.

PPC first acquired oil wells and leases in the Matthews Field in 2004. Its acquisitions included six existing wells, including a disposal injection well. In 2005, PPC drilled some additional producing wells, sold some the next year, and then repurchased those wells in 2014.

In addition to Basic, three other commercial disposal well operators—NGL, Goodnight, and APC—operate injection wells in the vicinity of PPC's oil wells. Basic's disposal well—the Orla Kessler No. 1—is about 2,400 feet from PPC's property and began operating in 2014. NGL's three wells are about 6,000 feet from PPC's property and began operating in 2012. APC's well is

2

about 6,300 feet away and began operating in 2018.

In August 2019, the battery tank serving three of PPC's oil wells experienced a sudden, uncontrollable surge of wastewater from one of the wells being served—the Lasell No. 2—which PPC had to "kill" by pumping heavy drilling mud down the wellbore. By the end of 2019, all PPC's wells had dropped out of production, one by one, because of uncontrolled water flow and increasing pressure.

PPC notified the four above-named nearby commercial disposal well operators of the problem and filed a complaint with the Texas Railroad Commission. The Commission ordered the four disposal well operators to cease operating for seven days while it investigated. But the Commission ultimately concluded it was "unable to attribute the increased pressure to local commercial disposal operations."

Due to the influx of wastewater and high pressure, all nine of PPC's producing wells were drowned, resulting in a total loss of all oil and gas reserves.

### B. Procedural history

PPC sued Basic, NGL, APC, and Goodnight for damaging its oil wells. Six months after filing suit, PPC settled with NGL, APC, and Goodnight, leaving Basic as the sole defendant. The case was tried to a jury that found Basic, APC, and NGL were negligent under the wording of the charge that we discuss below. The jury attributed 60% of the fault to Basic, 10% to APC, and 30% to NGL. The jury found that PPC had suffered damages in the amount of $11.5 million. After applying a settlement credit, and after adding prejudgment interest, the trial court entered a judgment for over $13 million for PPC against Basic.

## II. ISSUES ON APPEAL

Basic raises three issues on appeal, contending that: (1) the trial court erred by including in the jury charge a broad-form liability question improperly defining negligence to include

3

committing statutory "waste" and, having done so, further erred by failing to submit a related statutory "reasonably prudent operator" defense; (2) the trial court erred by admitting unreliable and prejudicial expert testimony; and (3) the jury rendered a verdict against the overwhelming weight of the evidence.

## III. THE JURY CHARGE

### A. Standard of review

We review a trial court's decision to submit or refuse a particular jury instruction under an abuse of discretion standard. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). A trial court has "considerable discretion" in selecting jury instructions. *Id*. But one way in which a trial court can abuse its discretion is by failing to follow guiding rules and principles. *Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018). One of those guiding principles is that a trial court must submit properly worded instructions authorized by law, and which find some support in the evidence. Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence"); *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Transcon. Ins. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010). In contrast, if the content of a jury charge definition is challenged as legally incorrect, our review is de novo. *Id.*

### B. The charge as given

Question 1 of the jury charge submitted in broad form (1) ordinary negligence and (2) negligence per se, based on how "waste" is defined in the Natural Resources Code:

> Did the negligence, if any, of those named below proximately cause the injury in question?
>
> "Negligence" means failure to use ordinary care; that is, failing to do that which a person of ordinary prudence would have done under the same or similar

4

circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

It is negligence to commit "waste." The term "waste" means the drowning with water a stratum or part of a stratum that is capable of producing oil or gas or both in paying quantities or underground loss, however caused.

Basic contends that Question 1 erroneously includes the second paragraph because it incorporates a strict liability standard from the Natural Resources Code that applies to the "production, transportation and storage of oil and gas." Because Basic is only in the wastewater injection business, it contends the strict liability waste standard does not apply to it. Basic alternatively claims that if the Code's waste standard does apply, the charge should have included a statutorily granted "reasonably prudent operator" defense. Without that addition to the waste instruction, Basic was exposed to a strict liability offense.

Basic argues that the charge thus commingles a legally valid theory of liability (ordinary negligence) with a legally invalid one (negligence per se based on "waste"), and we cannot know whether the jury relied solely on the invalid theory in finding Basic negligent.

## C.  Does the Natural Resources Code's prohibition of waste apply to Basic?

Section 85.321 of the Natural Resources Code provides a cause of action for those injured by "waste" as follows:

A party who owns an interest in property or production that may be damaged by another party violating the provisions of this chapter . . . or another law of this state prohibiting waste or a valid rule or order of the commission may sue for and recover damages and have any other relief to which he may be entitled at law or in equity.

Tex. Nat. Res. Code Ann. § 85.321. Under § 85.045, "[t]he production, storage, or transportation of oil and gas in a manner, in an amount, or under conditions that constitute waste is unlawful and is prohibited." *Id.* § 85.045. And under § 85.046, "waste" is defined to include "drowning with water a stratum or part of a stratum that is capable of producing oil or gas or both in paying quantities[.]" *Id.* § 85.046(2). Over Basic's objection, the charge contained these principles in an

5

instruction stating: "It is negligence to commit 'waste.' The term 'waste' means the drowning with water a stratum or part of a stratum that is capable of producing oil or gas or both in paying quantities or underground loss, however caused." Because Basic had to concede that its injection well was at least partially responsible for drowning out PPC's wells, the charge as given ensured that Basic would be found negligent.

Basic argues the negligence per se "waste" claim under Chapter 85 does not apply because it does not produce, store, or transport oil and gas. Rather, its only business is to inject wastewater back into the earth. And as a matter of statutory construction, it argues the term "production, storage, or transportation of oil or gas" does not include the operation of a disposal well. PPC responds that Basic's reading of §§ 85.045 and 85.046 is "myopic" and "fails to construe [these provisions] in context with the overall statutory scheme" of the Natural Resources Code.

In interpreting statutes, we endeavor to "ascertain and give effect to the Legislature's intent." *Bexar Appraisal Dist. v. Johnson*, 691 S.W.3d 844, 847 (Tex. 2024) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). "We look for that intent first and foremost in the plain language of the constitutional or statutory provision." *Id.* (quoting *Odyssey 2020 Acad., Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 540 (Tex. 2021)). "If the statute's plain language is unambiguous, we interpret its plain meaning, presuming that the Legislature intended for each of the statute's words to have a purpose and that the Legislature purposefully omitted words it did not include." *Id.* (quoting *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019)). The Natural Resources Code also expressly directs us to apply the Code Construction Act [Chapter 311 of the Government Code] "to the construction of each provision of this code[.]" Tex. Nat. Res. Code Ann. § 1.002. In turn, § 311.023 of the Government Code requires that we consider, among other things, the "object sought to be attained," the "circumstances under which the statute was enacted," and the "consequences of a particular

6

construction[.]" Tex. Gov't Code Ann. § 311.023 (1), (2), (5). As PPC points out, the Texas Supreme Court recognizes that "text cannot be divorced from context." *Worsdale v. City of Killeen*, 578 S.W.3d 57, 69 (Tex. 2019).

Here, Basic argues that under the "plain language" of § 85.045's "production, storage or transportation" of oil and gas does not include its operation of a disposal well. We turn first to the term "production" to see if it plainly excludes Basic. The Natural Resources Code does not define the term "production" (nor "production of oil and gas"). When a statute does not define a key term, we apply its common, ordinary meaning unless a contrary meaning is apparent from the statute's language. *Univ. of Texas at Arlington v. Williams*, 459 S.W.3d 48, 52 (Tex. 2015). "To determine a statutory term's common, ordinary meaning, we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Texas State Bd. of Examiners of Marriage & Fam. Therapists v. Texas Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017).

Based on dictionary definitions, "production" can have several meanings. It can broadly encompass the *process* of producing goods (here, resources). *See Production*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("1. the act or process of making or growing things, esp. those to be sold'); *Production*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2003) ("the act of producing, creation; manufacture"); *Production*, AMERICAN HERITAGE DICTIONARY, 2nd College Ed. (1991) ("The act or process of producing'"). PPC would rely on this broader definition to include wastewater disposal injection wells in the production process, because produced water "is brought to the surface as a necessary and unavoidable incident and byproduct of" oil and gas production and has to be disposed somewhere. But "production" also has narrower dictionary definitions. "Production" can be defined as only the item, or quantity of item, being produced. *See Production*, BLACK'S LAW DICTIONARY ("2. The amount of goods that are made or grown" . . ."7.

7

Mining. The quantity or amount of natural resources actually extracted or mined <oil and gas production>"). Basic would rely on a more restrictive use of the term, which limits the meaning of "production" to the actual extraction of oil and gas—something that Basic does not do.

Finding no clear common meaning dictionary definition, we turn to how the term "production" is used in the statutory framework. *See Texas Med. Ass'n*, 511 S.W.3d at 34–35 (looking to how term "diagnosis" is used in the relevant statutory scheme). And there, we note the use of the term "production" in other sections of the Natural Resources Code is used in both a narrow and broader sense. The term "production" and "produce" appear in the several titles and textual sections of the Natural Resources Code. For instance, in multiple sections, "production" refers to the quantity of oil or gas actually extracted from a well. *See* § 111.091 (prohibiting discrimination in purchase of "allowable production"); § 91.402 (setting payment deadlines for the "proceeds derived from the sale of oil or gas production from an oil or gas well); § 85.046(10) (defining one form of waste as "production of oil in excess of transportation or market facilities or reasonable market demand"); § 53.154 (authorizing the board to "set the royalty rate on production of sulphur, coal, lignite, salt, and potash"). That use of the word, however, does not make sense for § 85.045 because it is not referring to a quantifiable measure of oil or gas. And in other sections, it is used in the broader context of the act of extracting hydrocarbons. *See* § 85.046(b) ("[T]he commission may permit *production* by commingling oil or gas or oil and gas from multiple stratigraphic or lenticular accumulations[.]") (emphasis added); § 85.041(a) ("The purchase, acquisition, or sale, or the transporting, refining, processing, or handling in any other way, of oil or gas, *produced* in whole or in part in violation of any oil or gas conservation statute of this state or of any rule or order of the commission under such a statute, is prohibited.") (emphasis added); § 85.202(a)(1) (stating Commission rules and orders shall "prevent waste, as defined in Section 85.046 of this code, of oil and gas in drilling and *producing* operations and in the storage, piping,

8

and distribution of oil and gas[.]") (emphasis added). So contextual use of the term "production" in the Natural Resources Code does not provide a clear answer to its meaning in § 85.045.

Looking to the overall structure of the Natural Resources Code, we find that it does regulate wastewater from oil and gas production. Section 122.001 defines "[f]luid oil and gas waste" to include "flowback water, produced water, or other fluid that arises out of or is incidental to the drilling for or production of oil or gas." Tex. Nat. Res. Code Ann. § 122.001(2). Section 122.004 authorizes the Commission to issue rules "to govern the treatment and beneficial use of oil and gas waste" including "fluid oil and gas waste." And § 122.002 defines who owns (in the absence of an agreement) fluid oil and gas waste as it works its way through the process of treatment and disposal. More specifically, under Commission rules, Basic must account for any "identifiable liquid hydrocarbons" in the wastewater that it handles. 16 Tex. Admin. Code § 3.56 (2007) (Tex. R.R. Comm'n, Oil & Gas Div.).

Basic needed to obtain a permit for its disposal well. "Unless the activity is subject to the jurisdiction of the railroad commission" an entity must obtain its disposal well permit from the Texas Commission on Environmental Quality. Tex. Water Code Ann. § 27.011; § 27.002. But the Water Code makes the Railroad Commission "solely responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and subsurface water resulting from . . . *activities associated with* the exploration, development, and *production* of oil or gas or geothermal resources, including . . . activities associated with the drilling of injection water source wells which penetrate the base of useable quality water[.]" *Id.* § 26.131(a)(1)(A) (emphasis added). Thus, Basic needed its permit from the Railroad Commission. *Id*. § 27.031.

The Railroad Commission's rules for injection well permitting are found in the Texas Administrative Code in Chapter 3 (Oil & Gas Division). If the party intends to dispose of fluids into formations that are not productive of oil and gas, they are responsible for complying with the

9

Water Code and "Title 3 of the Natural Resources Code." 16 Tex. Admin. Code § 3.9 (2007) (Tex. R.R. Comm'n, Oil & Gas Div.). If they engage in "fluid injection operations in reservoirs productive of oil, gas, or geothermal resources" they must obtain a permit which will issue only "when the injection will not endanger oil, gas, or geothermal resources or cause the pollution of freshwater strata unproductive of oil, gas, or geothermal resources." 16 Tex. Admin. Code § 3.46(a) (2007) (Tex. R.R. Comm'n, Oil & Gas Div.).[1]

We are also tasked with looking to existing court decisions to determine a term's meaning. *See Brown v. City of Houston*, 660 S.W.3d 749, 752 (Tex. 2023) (stating court precedents "can provide authoritative and binding construction" of statutes). Here the cases discussing § 85.045 are instructive, but not controlling. Basic relies on *Foshee Ref. Co. v. State*, 73 S.W.2d 1098 (Tex. App.—Texarkana 1934, no writ). In *Foshee*, the court held an oil refinery operator was not engaged in "production, storage, or transportation" of oil based on the general rule of statutory construction that "the express mention or enumeration of one person or thing or consequence is tantamount to an express exclusion of all others." *Id.* at 1100. In other words, refining is not production, storage, or transportation.[2] Similarly, a federal district court has held that the "production, storage, or transportation" of oil does not include efforts to "kill" a "wild cratered or burning oil well." *Ivey v. Phillips Petroleum Co*, 36 F.Supp. 811, 814 (S.D. Tex. 1941).[3] But

---

[1] Basic urges that this part of the Administrative Code provides its own remedy: cancellation of the permit by the Railroad Commission, which obviates the need for any other remedy. But permit-related requirements are not necessarily inconsistent with civil liability. *See FPL Farming Ltd. v. Env't Processing Sys., L.C.*, 351 S.W.3d 306, 314 (Tex. 2011) ("[T]he mere fact that an administrative agency issues a permit to undertake an activity does not shield the permittee from third party tort liability stemming from consequences of the permitted activity.").

[2] The Legislature made that point clear in former Tex. Rev. Civ. Stat. Ann. art. 6014a that provided "The commission shall have no authority to make any rule, regulation or order in any wise determine or hold that any mode, manner, or process of refining crude petroleum oil constitutes waste." Act of April 8, 1935, 44th Leg., R.S., ch. 76, § 3, sec. 2, 1935 Tex. Gen. Laws 180, 183 (codified at Tex. Civ. Stat. Ann. art. 6014a) (repealed by Act of May 24, 1977, 65th Leg., R.S., ch. 871, § 2, 1977 Tex. Gen. Laws 2345, 2689).

[3] *Ivey* reasoned that § 85.045's predecessor, which similarly prohibited the production, storage, or transportation of

neither *Foshee* nor *Ivey*—nor any other authority cited by Basic—address whether the disposal of oil and gas byproducts from production might, like the refining of oil or the killing of wild wells, stands apart from "the production, storage, or transportation" of oil and gas.[4]

PPC focuses on other authorities to support its contention that disposal well operators are involved in "the production, storage, or transportation" of oil and thus subject to § 85.045's prohibition against "waste." First, PPC argues that the only case to have considered a similar issue "rejected an attempt to artificially limit liability for waste in the conduct of operations that are necessarily incidental to oil and gas production," citing *Exxon Corp. v. Miesch*, 180 S.W.3d 299, 318–19 (Tex. App.—Corpus Christi 2005), *aff'd in part & rev'd in part on other grounds*, 348 S.W.3d 194 (Tex. 2011). In *Miesch*, Exxon requested a royalty reduction on producing wells in a particular field. 180 S.W.3d at 311. When negotiations failed, Exxon plugged and abandoned its own wells. *Id*. at 312. In the reentry process, the subsequent mineral lessee encountered "numerous unexpected obstacles," including "tubing, refuse, and junk in some of the wellbores." *Id.* When Exxon was sued for "waste," it argued that § 85.045 "only prohibits waste in the 'production, storage, or transportation' of oil or gas," while the plaintiff complained only of "waste in plugging." *Id*. at 318–19.

The court disagreed with Exxon's "narrow reading," holding that, "[b]ased on the plain language of the [Natural Resources C]ode and long-standing precedent from the Texas Supreme Court," § 85.045 "prohibits all waste of oil or gas, including the type of waste caused by Exxon in

---

oil or gas in such a manner as to constitute "waste," dealt "only with the general operation of wells and leases," and "[c]learly, it seem[ed] to [the court], it would be a strained construction of the statute to hold that defendant, by reason of any of the acts or omissions charged against it, [came] within [the statute]." 36 F.Supp. at 814. *Ivey* also held that "The burden of proof was upon the plaintiff," who "wholly failed to show any facts bringing the defendant under the provisions of the Texas conservation statutes." *Id*. at 818.

[4] On this point, as Basic points out, 38 AM. JUR. 2D *Gas and Oil* § 140 (2024) expressly states, without citing any legal authority, that "[t]he legislation concerning the inappropriate waste of oil or gas does *not* . . . include the disposal of materials from oil or gas production" (emphasis added by Basic).

11

the instant case." 180 S.W.3d at 319 (citing *R.R. Comm'n v. Shell Oil Co.*, 206 S.W.2d 235, 240 (1947) (discussing similar language in precursor statute regarding production, storage, or transportation as "sweeping language . . . by which all waste in the handling of oil and gas was declared unlawful")).

Basic counters that *Miesch* is inapposite because Exxon was sued for "wrongful conduct in the development . . . of oil and gas wells," and "a deliberate pattern of sabotage[e]" to "thwart competition." And *Miesch* proceeds on the assumption that Exxon is primarily in the business of producing oil and gas, and not the ancillary business of plugging wells. In contrast, Basic does not produce any oil and gas. *See Foshee*, 73 S.W.2d at 1100 (holding that, to be subject to the predecessor to § 85.045, a party "must be *principally* engaged in the business of [producing, storing, or transporting] oil") (emphasis added).

PPC also argues that this Court and Eastland Court of Appeals have already held that Chapter 85's prohibition against waste applies to injection well operations (citing *Ring Energy v. Trey Res., Inc.*, 546 S.W.3d 199, 207 (Tex. App.—El Paso 2017, no pet.) and *Discovery Operating, Inc. v. BP America Production Co.*, 311 S.W.3d 140, 145, 161–63 (Tex. App.—Eastland 2010, pet. denied)). Still, the injection well in *Ring* was used as "part of a secondary recovery method to enhance oil production." *See* 546 S.W.3d at 204 (noting that "injection wells used for secondary recovery . . . are at issue here"). And *Discovery* did not analyze the scope of the statutory categories of "production, storage, and transportation" of gas, but merely mentioned the phrase once in passing. 311 S.W.3d at 159.

Finding no clear answer in dictionaries, use of the term in the Code, or in prior case law, we turn to the statutory history and the context in which the term appears. By statutory history, we mean only the evolution of the relevant provisions using the term over time. *See Brown v. City of Houston*, 660 S.W.3d 749, 755 (Tex. 2023) (distinguishing statutory history (progression of a

12

statute's text over time) from legislative history (extrinsic aides, such as legislative reports and the like)). And by "context" we mean only that "the disagreement in this case is not over words and cannot be resolved with dictionaries. It is over consequences and can only be settled by examining how the statutory provisions fit in the context of the [] Act as a whole." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 451 (Tex. 2009) (Hecht, C.J., concurring). For context here, we examine the overall regime of the Natural Resources Code for preventing waste.

The Texas Constitution was amended in 1917 to declare the conservation and development of the natural resources of Texas a public right and duty—and directs the Legislature to "pass all such laws as might be appropriate" to these ends. Tex. Const. art. XVI, § 59(a). The Texas Legislature responded quickly, passing S.B. 350 in 1919 that stated: "Natural gas and crude oil or petroleum shall not be produced in the State of Texas in a such a manner and under such conditions as to constitute waste." Act of March 17, 1919, 36th Leg., R.S., ch. 155, art. 1, 1919 Tex. Gen. Laws 285. The parties responsible for preventing waste was broadly stated in 1919 to include all operators, contractors, drillers, pipeline companies and gas distributing companies that drill or produce oil or gas—language carried forward in our current Code. *Id.* at 286 (originally codified at Tex. Rev. Civ. Stat. Ann. art. 6015, now Tex. Nat. Res. Code Ann. § 91.015).

That same 1919 enactment also defined waste to include "drowning with water of a gas stratum capable of producing gas in commercial quantities." *Id.* By 1929, the provision was expanded to outlaw waste in the production, transportation, and storage of oil and gas, and also expanded the definition of waste to include drowning out of oil wells. Act of March 29, 1929, 41st Leg., R.S., ch. 313, § 2, art. 6014, 1929 Tex. Gen. Laws 694. This statutory history at least tells us that the flooding of oil wells has been a longstanding concern of the Legislature. It also tells us that the prohibition of waste in production was viewed broadly—it applied both to the "manner" and "conditions" of production (language still found in § 85.045 today) and applied to

13

diverse players connected to the industry. *See Corzelius v. Harrell*, 186 S.W.2d 961, 963 (Tex. 1945) (These statutory schemes governing waste in production "must be considered in light of Article XVI, Section 59a of the Constitution").

We have stated that "produced water is more accurately classified as a waste byproduct of oil and gas production." *Cactus Water Servs., LLC v. COG Operating., LLC*, 676 S.W.3d 733, 739 (Tex. App.—El Paso 2023, pet. filed). And the problem of what to do with wastewater from oil and gas production is hardly a new phenomenon. *See Teel v. Rio Bravo Oil Co.*, 104 S.W. 420, 421 (1907, no writ) (resolving landowner's suit for damages to his property from saltwater emanating from an oil well); *Producers' Oil Co. v. Bean & Markowitz*, 147 S.W. 1166, 1167 (Tex. App.—Fort Worth 1912, no writ) (same); *Magnolia Petroleum Co. v. Aiken*, 289 S.W. 152, 153 (Tex. App.—Eastland 1926), *modified sub nom. Magnolia Petroleum Co. v. Akin*, 11 S.W.2d 1113 (Tex. [Comm'n Op.] 1928) (same); *Texas Pac. Coal & Oil Co. v. Taylor*, 47 S.W.2d 1110, 1111 (Tex. App.—Eastland 1932, no writ) (same); *Nash & Windfohr Oil Corp. v. Johnson*, 81 S.W.2d 749, 750 (Tex. App.—Fort Worth 1935, writ dism'd) (same). Perhaps not surprisingly, the widespread use of injection wells to dispose of saltwater generated from oil and gas wells began in earnest in the 1930s.[5]

Understanding the Legislature's concerns with waste, the Texas Supreme Court more than half a century ago provided guidance on interpreting the legislative waste provisions: "Whatever

---

[5] EPA, "General Information About Injection Wells" https://www.epa.gov/uic/general-information-about-injection-wells (last visited October 18, 2024) ("Widespread use of injection wells began in the 1930s to dispose of brine generated during oil production. Injection effectively disposed of unwanted brine and preserved surface waters; J.E. Clark, D.K. Bonura, F.F. Van Voorhees, *An Overview of Injection Well History in the United States of America*, 52 DEVELOPMENTS IN WATER SCIENCE, 3–12 (2005) ("Disposal of liquids into underground formations through injection wells was started in the 1930s by the U.S. petroleum industry, which, as a common practice, disposed of produced brine in this manner."); *see also Magnolia Petroleum Co. v. State*, 218 S.W.2d 855, 859 (Tex. App.—Austin 1949, writ ref'd n.r.e.) (noting the use of injection wells to dispose of produced saltwater); *Alliston v. Shell Petroleum Corp.*, 55 P.2d 396, 403 (Kan. 1936) (describing claim where injected saltwater polluted freshwater stratum); *W. Edmond Hunton Lime Unit v. Lillard*, 265 P.2d 730, 731 (Okla. 1954) (suit by holder of oil and gas lease against operator of saltwater injection well for destroying productivity of oil and gas wells).

the dictates of reason, fairness, and good judgment under all the facts would lead one to conclude is a wasteful practice in the production, storage or transportation of oil and gas, must be held to have been denounced by the legislature as unlawful." *Shell Oil Co.*, 206 S.W.2d at 240. And almost half a century later, the Texas Supreme Court remained consistent, stating, with regard to the Railroad Commission's authority, "[a]s general and all-inclusive authorization as can be pictured is presented not only by the language of this subsection, but generally by the statutes under consideration." *Railroad Comm'n of Texas v. Lone Star Gas Co., a Div. of Enserch Corp.*, 844 S.W.2d 679, 687 (Tex. 1992) (referencing the statutes under consideration as including Article 6014 (now §§ 85.045–.047, 85.125 and 85.203 of the Natural Resources Code)). We are reminded that "[i]t is the plain duty of the courts to give them, within constitutional bounds, a scope no less broad and effective than the legislative intent they so evidently manifest." *Id*.

Wastewater is inherent to the production process. Flooding out of producing strata is a long-recognized form of waste. The Railroad Commission is given specific jurisdiction over and should not approve an injection well that endangers oil, gas, or geothermal resources. 16 Tex. Admin. Code § 3.46 (Tex. R.R. Comm'n, Oil & Gas Div.). And "[i]t is utterly impossible for the Legislature to meet the demands of every detail in the enactment of laws relating to the production of oil and gas." *Corzelius*, 186 S.W.2d at 964. It would be incongruous to the policies embedded in the Natural Resources Code to divorce wastewater's disposal from the Code. That is, it would be an odd result if the Legislature intended for a company whose sole business is injecting wastewater into the strata of an oil and gas field to have more freedom in committing waste than an oil and gas operator that disposes of its own wastewater. The "sweeping"[6] statutory prohibitions

---

[6] *Texas R.R. Comm'n v. Shell Oil Co*., 206 S.W.2d 235, 240 (Tex. 1947):

> The second sentence of Article 6014 significantly prefaces an enumeration of ten specific wasteful

15

against statutory waste could be thwarted by simply outsourcing the disposal of wastewater to a stand-alone injection well business.[7]

We conclude that the waste prohibition in § 85.045 as it pertains to production of oil and gas includes the handling of wastewater or produced water from oil and gas production. That provision thus applies to Basic.

### D. Was Basic entitled to the reasonable operator instruction?

But also as part of the statutory scheme, an operator may defend an allegation of waste by showing that it acted as a reasonably prudent operator. The very section that gives PPC a right to sue for waste, also allows for a reasonably prudent operator defense. Tex. Nat. Res. Code Ann. § 85.321 ("Provided, however, that in any action brought under this section or otherwise, alleging waste to have been caused by an act or omission of a lease owner or operator, it shall be a defense that the lease owner or operator was acting as a reasonably prudent operator would act under the same or similar facts and circumstances."). Basic pleaded the defense and submitted a charge instruction tracking the statutory language, which the trial court denied.

PPC's objection to the instruction below, and now on appeal, is that Basic submitted no evidence to support the submission of the instruction. More specifically, PPC contends that Basic

---

practices with the declaration that waste among other things should specifically include the practices there interdicted. That language must have been deliberately selected to avoid narrowing the sweeping language in the first sentence of the article, by which all waste in the handling of oil and gas was declared unlawful and prohibited, as well as to preserve the wide scope of Article 6015, which was aimed with the utmost generality at the prevention of waste. . . . The constitution had vested in the lawmaking body the duty of preventing waste, not of part but of all the natural resources of this State, and it must not be considered that the legislature meant by its enactments to discharge less than the full duty which was thus entrusted to it.

[7] We recognize that even if the Natural Resources Code waste provisions were not to govern Basic, it would still be subject to ordinary negligence liability. The ultimate question here is who carries the burden of proof at trial on an essential element of the liability question. Under the Natural Resources Code, Basic is liable if PPC carries its burden to show Basic drowned out a productive stratum, and Basic is unable to show that it acted as a reasonably prudent operator. The Pattern Jury Charge incorporates these split burdens asking in one question if the defendant committed waste, and then in a separate question whether the defendant acted as a reasonably prudent operator for the conduct described in the previous question. State Bar of Tex., Texas Pattern Jury Charges—Oil and Gas, PJC 302.8 and 302.9 (2022).

16

needed to offer expert testimony on the duty of care for a reasonably prudent operator and some evidence that it met the burden. A trial court must submit those instructions authorized by law and which find some support in the evidence. Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence."); *United Scaffolding*, 537 S.W.3d at 469. So the question before us is whether the record contains more than a scintilla of evidence that supports submission of the instruction. *See Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) ("To determine whether legally sufficient evidence supported Dr. Elbaor's contributory negligence submission, we must examine the record for evidence supporting Dr. Elbaor's question and ignore all evidence to the contrary."). We conclude that it does.

At trial, Basic conceded that its injection of wastewater caused some of the flooding of PPC's wells. It did not, however, concede that it was negligent. It relied on several arguments with evidence to contest negligence.

**(1) Basic presented evidence that it exercised some care in selecting the site for the Orla-Kessler No. 1 well.**

Gary Prichett oversaw operating Basic's Permian Basin disposal wells. He testified that Basic hired a geologist, Robert Fedro, to assist in the selection of the Orla-Kessler well-site who gave it his "stamp of approval." Fedro, a licensed petroleum geologist with 41 years of experience, performed the location study for Basic in 2011. His work had focused for the past 30 years on the Delaware Basin where these wells are located. Fedro looked at a nine-section area and available well logs for those sections to understand the porosity of the geology. He acknowledged he was aware of PPC's wells to the east and north of the Orla-Kessler site. But he did not think that the

17

injection well posed any "risk at all" to PPC's wells.[8]

James Newman, Basic's executive vice-president of operations, testified that Basic selected the Orla-Kessler No. 1 location because it was "isolated" and the only well on that section of land. Other disposal operators were already injecting into the Delaware Mountain Group.

**(2) Basic complied with the Railroad Commission's permitting process for the Orla Kessler No. 1, which would not issue if it would endanger oil, gas, or geothermal resources.**

To obtain a saltwater disposal permit, Basic had to meet several requirements imposed by the Texas Railroad Commission. First, Basic must have been a registered operator with the State. It had to post a plugging bond for all its operational wells. Basic needed to determine the depth for any freshwater. It had to obtain a drilling permit and needed to develop a wellbore design. It had to notify adjacent surface owners, and offset operators in the area. It also had to post notice in the local newspaper. Basic presented some evidence that it complied with each of these requirements in obtaining its permit.

The jury heard testimony from PPC's regulatory expert, Robert Henkhaut, that under Texas Railroad Commission rules, it should not issue a permit for saltwater disposal injection if to do so would endanger existing oil and gas resources.[9] He agreed that the Railroad Commission did its "job" in issuing this permit. He also agreed that he had no evidence that Basic or the Railroad Commission knew the Orla Kessler No. 1 might endanger existing production.

**(3) Basic operated the Orla Kessler No. 1 within its permit parameters from 2014 through 2019 without any complaints.**

---

[8] That said, Fedro was not aware of the volumes of water that Basic would be injecting, he is not a reservoir engineer, and this was his first saltwater injection well consult. By setting out the evidence supportive of the charge instruction, we do not discount that PPC presented evidence to the contrary.

[9] That is a correct statement of law. *See Ring Energy v. Trey Res., Inc*., 546 S.W.3d 199, 204. (Tex. App.—El Paso 2017, no pet.) ("The permit will only issue if the 'injection will not endanger oil, gas, or geothermal resources or cause the pollution of freshwater strata unproductive of oil, gas, or geothermal resources.'"); 16 Tex. Admin. Code § 3.46(a) (2007) (Tex. R.R. Comm'n, Oil & Gas Div.) (same).

The permit limited Basic to injecting no more than 20,000 barrels a day. During the life of the well, Basic was injecting much less—just under 5,000 barrels a day. The well injects water into a specified "interval" which Basic adhered to. Its permit was never suspended or revoked by the Commission. The well never failed an inspection and Basic met all its annual reporting requirements to the State. PPC's expert, Robert Henkhaut, conceded that from 2011 to 2019, Basic operated its well in accordance with the permit's parameters. This lawsuit was the first instance that Basic's employees could recall where one of its wells impacted existing production.

**(4) If expert testimony for the standard of care is required, the record contains some evidence for the standard and some evidence of compliance.**

Assuming without deciding that PPC is correct that only expert testimony can establish the standard of care, we find some evidence of the standard, and compliance with the standard in the trial record. PPC's expert, Robert Henkhaut, was asked what due diligence a reasonably prudent operator should have exercised before drilling and injecting the Orla-Kessler No. 1 Well. He testified the proper course would be to identify the production wells in a two-mile radius and do enough geology work to understand where the injected water will go, to determine whether there is a "realistic possibility" that the wastewater injection could flood out offsetting oil production. And if the well is already drilled, "it needs to be reviewed to see if there's a potential for something happening once it's known and became aware of this." He agreed that injecting wastewater into the Delaware Mountain Group was a common practice. Henkhaut agreed the standard he described is not written in a book, but a "reasonable mind should . . . look forward as far as they can, but necessarily backwards." He concluded that "a reasonable operator could look forward and see that there was a [possible] risk of such happening, and that risk may have been above their tolerance level and maybe they should go do something else instead."

Accepting this as the standard, Basic presented some evidence that it met the standard. When the Orla Kessler No. 1 was drilled in 2014, Fedro looked one-quarter to one-half of a mile from the proposed well site, based on what he understood the Railroad Commission required at the time. Even at that, he had pulled drilling records for a nine-section area that would have encompassed at least a 2-mile radius of the proposed well, including PPC's wells. In 2017, Basic investigated drilling a second deeper well at pad site and employed Fedro to review that proposed well (which ultimately was never drilled due to market conditions). By that time Fedro made it his practice to look two miles out from the proposed site. And he still felt comfortable that the fluid injection was far enough away to avoid impacting existing production.

The court in *Miesch*, concluded that an operator failed to prove as a matter of law that it acted as a reasonably prudent operator by not complying with Railroad Commission requirements or industry standards, and acting in variance with others were doing in plugging wells. *Miesch*, 180 S.W.3d at 323–24. It would equally follow that complying with Railroad Commission rules and procedures, and acting as others in the same industry would at least be some evidence of meeting the standard. We conclude it was error to omit an instruction on a reasonably prudent operator.

### E.   Omission of the reasonably prudent operator instruction was reversible error

We will not reverse a judgment for charge error unless it "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case [on appeal]." *Thota*, 366 S.W.3d at 687; Tex. R. App. P. 44.1(a). Stated otherwise, "when a trial court refuses to submit a requested instruction that is otherwise proper, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Gunn*, 554 S.W.3d at 675.

"To determine whether the instruction probably caused an improper judgment, we examine the entire record." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001); *see also Matter of Estate of Poe*, 648 S.W.3d 277, 285–86 (Tex. 2022). And in reviewing the record, "charge is generally considered harmful if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). Additionally, an improper instruction is especially likely to cause an improper judgment when "the trial is contested and the evidence sharply conflicting." *Quantum Chem. Corp.*, 47 S.W.3d at 480.

Here, we can say with certainty that the charge as given made Basic's negligence a foregone conclusion. The charge told the jury that flooding a productive stratum with water is negligence, "however caused." While Basic originally believed its well did not flood PPC's productive strata, by the time of trial, additional expert review convinced it otherwise, and it conceded that fact to the jury. So PPC's counsel was able to make this argument in closing:

> Now, the judge in this lawsuit has included in his instruction that it is negligence to commit waste. You heard Mr. Henkhaut say that Basic has committed waste. The term "waste" means the drowning with water a stratum -- that means the rock -- or part of a stratum that is capable of producing oil and gas or both in paying quantities. That's exactly what happened here. You heard it from Tim Smith. You heard it from Dr. Wiggins. Basic drowned Mr. Priest's well and the rock from which they produced with its wastewater. That is negligence and that's instructed.

Two related questions dictate the harm analysis. Was the jury's "yes" answer to question based only on its first paragraph—the negligence/ordinary care instruction? And if not, would the jury have been able to find that Basic acted as a reasonably prudent operator based on the evidence at trial. Both these questions turn on how closely contested was the evidence of Basic's adherence to the standard of care. To be sure, PPC expert testified that Basic did not meet the reasonably prudent operator standard as he described it. He believed that after identifying producing wells within a two-mile radius, a reasonably prudent operator "probably would have chosen a different interval." If a well had already been drilled, a reasonably prudent operator should review it "to see

21

if there's a potential for something happening once it's known and became aware of this." And he believed that Basic's injected water was migrating outside its proper interval, requiring Basic to suspend its injections.

Yet as we detail above, Basic had some answers to these claims. It hired an expert knowledgeable in the Delaware Mountain Group to verify its well site. It obtained a permit from the Railroad Commission that is charged with approving the permit only if it would not threaten surrounding production. It operated the well at well below its permitted capacity. Neither Basic, nor the Railroad Commission had knowledge that injected water was escaping its interval. Years after its well began operation, Basic investigated the possibility of drilling a deeper well, and its expert again reviewed surrounding production wells, including PPC's, and believed a new well would not threaten production. The jury is the ultimate purveyor of this conflicting testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony."). Yet without the reasonably prudent operator instruction, Basic had no chance of prevailing on liability. With the instruction, it could put the evidence to the test of weight and credibility which only a fact-finder can do. We conclude that the reasonably prudent operator submission was "reasonably necessary to enable the jury to render a proper verdict." *See Gunn*, 554 S.W.3d at 675. It relates to a contested critical issue in the trial, and its omission distorts the legislative scheme defined by § 85.321 and § 85.045 of the Natural Resources Code. The omission constitutes harmful error and requires a new trial. Tex. R. App. P. 44.1(a).

## IV. REMAINING ISSUES

In its second issue, Basic contends that the trial court erred in failing to strike PPC's expert who testified to apportionment of fault and damages. We decline to opine on an expert who may or may not offer the same testimony in the next trial. Likewise, we decline to rule on Basic's third

22

issue—factual insufficiency of the record to support the verdict—as it seeks only a new trial which we have already granted.

## V.  CONCLUSION

For the reasons stated above, we reverse the trial court's judgment and remand the case for a new trial.

JEFF ALLEY, Chief Justice

December 27, 2024

Before Alley, C.J., Palafox and Soto, JJ.
Palafox, J., dissenting